**UNITED STATES of America,
Appellee,**

v.

**Richard Albert JENKINS et al.,
Appellants.**

**Nos. 691, 712, 713 and 739, Dockets 73–2414, 73–2458, 73–2459 and 73–2461.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 18, 1974.

Decided April 5, 1974.

Emil H. Frankel, Stamford, Conn., for appellant Wilcox.

Thomas D. Clifford, New Haven, Conn., for appellant Hall.

J. Daniel Sagarin, Bridgeport, Conn., for appellant Jenkins.

Robert G. Oliver, New Haven, Conn., for appellant Morrow.

Andrew B. Bowman, Asst. U. S. Atty. (Stewart H. Jones, U. S. Atty., D. Conn., Bridgeport, Conn., of counsel), for appellee.

Before FRIENDLY and MANSFIELD, Circuit Judges, and ZAMPANO, District Judge.*

MANSFIELD, Circuit Judge:

After a jury trial before Judge Jon O. Newman of the District of Connecticut appellants were found guilty of robbing the Hayestown Avenue Branch of the Union Trust Company in Danbury, Connecticut, on September 14, 1972, in violation of 18 U.S.C. §§ 2113(a), (b) and (d), and 2(a) and (b). Jenkins and Wilcox were sentenced to 18 years and Hall to 8 years in prison. Morrow was sentenced, pursuant to the penal section of the Federal Juvenile Delinquency Act, 18 U.S.C. § 5034, to the custody of the Attorney General for the period of her

* Of the United States District Court for the District of Connecticut, sitting by designation.

minority. Upon this appeal they contend that a plethora of errors mandate reversal. We disagree, and for the reasons stated below we affirm the judgments of conviction against Jenkins, Wilcox and Hall but we remand the judgment of conviction against Morrow in order that its form may be made to comply with 18 U.S.C. § 5034.

■ The prosecution of appellants arose out of the armed robbery of the Hayestown Avenue Branch of the Union Trust Company in Danbury, Connecticut, on the morning of September 14, 1972. The evidence, viewed in the light most favorable to the government, United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972), reveals the following:

At the time of the robbery some bank employees and several customers were present in the bank. According to these witnesses—some 15 in all—the robbery was carried out by approximately four or five persons, all of whom were Negro and at least one of whom was female. At 10:15 A.M., as Darlene Smith, a teller working at the bank's drive-in window, was attempting to serve a Negro male sitting in a stationwagon, another Negro male strode into the bank's lobby with a gun in one hand and in the other a can of spray paint which he quickly used to spray over the lens of the bank's surveillance camera. Seconds later this initial intruder, who was bearded from sideburn to sideburn and wore a brown felt hat with a piece of torn material on it and a shiny brown leather jacket, substituted a black pistol for his can of paint and stood in the center of the bank floor, forcing everyone to stand still. Thereupon a Negro female, clad in slacks and wearing a woman's stocking over her head, and a Negro male, wearing sunglasses and a shirt with crew neck, entered the bank, leaped over the teller counters and collected money from the bank's vault, where the bank manager and the head teller were located, and from the teller counters. The robber wearing sunglasses carried a snub-nosed revolver. Included in the money collected and put in a light canvas shopping bag held by the female robber were some bills which had been marked "mutilated" and some "bait money," i. e., money whose serial numbers had previously been recorded.

The robbers remained in the bank for only a short period of time, a matter of several minutes. As they were leaving they instructed everyone in the bank to lie on the floor but, in their haste, they left behind a paper bag which later turned out to bear appellant Morrow's fingerprint on it. Immediately after the robbers had left John Patton, a bank customer, ran to a window and saw the robbers drive off in the Ford stationwagon which had been parked just minutes earlier at Darlene Smith's drive-in window. The car bore Connecticut registration plates matching those on a Ford stationwagon stolen earlier that morning.

The government offered both direct and circumstantial evidence to support its charge that appellants were the robbers. In addition to eyewitness testimony by some who were present at the robbery itself, proof was introduced to show that on September 1, 1972, two weeks before the robbery, Wilcox, Hall and Morrow, accompanied by Mrs. Hall, the Halls' baby and one James Bailey, arrived in Danbury in Wilcox's late model red and white Mercury Cougar bearing North Carolina license plates and began frequenting the residence of one Daisy Mae Blakney, 42A Virginia Avenue, Danbury. Several days prior to the robbery Roy Johnsen, the bank's head teller and Darlene Smith, one of the other tellers, had seen two Negroes parked outside the bank in an automobile matching the description of Wilcox's Cougar. On the night before the robbery Jenkins and his friend Corinne Shelly were joined by Wilcox at the Palace Theatre in Danbury.

Early on the morning of September 14, 1972, several hours before the robbery, Jenkins obtained a .38 calibre silver plated gun with a pearl handle and a black gun with bullets from Corinne Shelly and Mary Council. Jenkins, Mor-

row, Wilcox and Hall then departed in two cars. Less than an hour later Wilcox, Hall and Morrow were seen at 42A Virginia Avenue, Daisy Mae Blakney's house. At some point during the morning a 1965 Ford Country Squire stationwagon owned by one James Cavanaugh was stolen from a Danbury parking lot. Within a half hour before the robbery a tall Negro male purchased a can of black spray paint in a paper bag from a Grant's store located in the same shopping center as the bank.

Shortly before 11:00 A.M., which was less than a half hour after the robbery, four or five black persons were seen to alight from a stationwagon, one carrying a dark bag, at a point about one mile from the bank and 620 feet from 42A Virginia Avenue (Daisy Mae Blakney's residence). They proceeded toward the latter address while the driver remained in the car and drove it away. Within a short time Wilcox, Morrow, Hall and Bailey arrived at 42A Virginia Avenue, Hall with a white handled gun protruding from his belt. There they were joined by Jenkins. By early afternoon Jenkins, who had worn a beard and an Afro hair style in the morning appeared with a clean-shaven face and clipped hair. Corinne Shelly, who had in the morning obtained the guns for Jenkins before the robbery, asked Jenkins if he had robbed the bank, to which he replied "yes," giving details as to the robbery.

Two hours after the robbery the stolen getaway stationwagon was discovered in Danbury, with a "popped" ignition and the motor running, a short distance from the point where the four or five Negroes were seen to have left it. On the rear view mirror was appellant Hall's fingerprint. On the seat was a black plastic can-top, a Grant's sales slip (later identified as issued on the morning of the robbery by the Grant store near the bank) and a gold button. James Tallon, Chief of the Danbury Police Department, and Robert O'Neil, an agent of the Federal Bureau of Investigation, immediately began an investigation through the neighborhood where

the car was discovered, which led them within an hour to the home of Daisy Mae Blakney at 42A Virgina Avenue. The officers were permitted to enter the Blakney home by a woman named Frances Gary, who was Mr. Blakney's sister and who rented the back bedroom of the first floor of the home. There were four rooms on the first floor, including a front bedroom, a kitchen, dining room, and then Gary's back bedroom. As they were led through the front bedroom and into the kitchen, Tallon and O'Neil observed several persons in the house including three Negro males and a female. Two of the males would not produce any identification while the third produced a North Carolina driver's license bearing the name Lyles. When O'Neil accompanied one of the males into the back bedroom rented by Frances Gary he observed a light green shopping bag leaning against one of the sofas in the room. Later, when he returned from the kitchen into the front bedroom to make a telephone call (with Frances Gary's permission) he observed a shotgun which was plainly visible behind a dresser in the corner.

On the basis of their observation of the shopping bag and shotgun, Tallon and O'Neil obtained a search warrant for the Blakney home, which they executed the next day, September 15, 1972, at 6:30 in the morning. In the course of this search, which extended to a detached garage, several incriminating items were discovered and seized, including a .38 calibre chrome plated gun with a pearl handle of the type obtained by Jenkins a few hours before the robbery, a paper cup containing six .38 calibre bullets, a shiny brown leather jacket and a brown felt hat, both of the type worn by one of the robbers, and a can of black enamel spray paint. One of the jacket's gold buttons was missing. The others matched the one button found in the stolen getaway car.

Following the robbery bank customers Abdella, Leiss and Evans were shown a number of photographs by the investigators. Both Abdella on the day of the

robbery and Leiss five days later—on September 19, 1972—made a photographic identification of appellant Jenkins as the "floorman," i. e., the robber who had stood in the middle of the bank lobby during the robbery while others collected the loot. Evans, on the other hand, picked two photographs, one of appellant Wilcox and the other of a person named Arthur Sims, from the spread.

As a result of the investigation federal arrest warrants were issued for all appellants plus James Bailey, whom Tallon and O'Neil had observed in the presence of the others at the Blakney home shortly after the robbery. On September 21, 1972, appellant Hall was arrested in Charlotte, North Carolina. A search of the car from which he had just walked away, a second-hand bronze Eldorado purchased by his wife Magnolia for $2,199 cash in Pennsylvania just two days after the robbery, led to the discovery of several bills, one of which was stamped "mutilated." When questioned Hall denied having been in Danbury on the day of the robbery and said that on that day he had been in Glassboro, New Jersey, where he had gone to look for a man named Danny Lyle at the home of Lyle's mother, whom Hall knew as "Granny." However, he could not furnish "Granny's" address or its location in Glassboro.

On October 15, 1972, one month after the robbery, Wilcox was arrested and jailed in New Jersey on a concealed weapon charge. Among several bills in his wallet, which were turned over to the jailor for safekeeping and later seized, were 11 five-dollar bills bearing the same serial numbers as those that had been recorded as being on some of the "bait money" taken from the Union Trust Company in the robbery.

On September 25, 1972, a federal grand jury sitting in New Haven, Connecticut, returned a three-count indictment charging Jenkins, Hall, Wilcox, Bailey and Morrow with bank robbery in violation of 18 U.S.C. §§ 2113(a) (Count 1), 2113(b) (Count 2), and 2113(d) (Count 3). Thereafter Lynn Morrow was dismissed from the indictment on the government's motion because she had not attained the age of 18 years at the time the crime was committed. However, she consented to be treated as a juvenile pursuant to the Federal Juvenile Delinquency Act, 18 U.S.C. §§ 5031–5037, and pleaded not guilty to a three-count information charging violation of the same federal bank robbery statutes. On February 23, 1973, Judge Newman granted the government's motion pursuant to Rule 13, F.R.Cr.P., to have Morrow's information consolidated for trial with the indictment of Jenkins, Hall, Wilcox and Bailey. The principal government witnesses at appellants' trial, besides those who were in the bank on September 14, 1972, and the government agents who subsequently investigated the robbery, were Corinne Shelly, Mary Council and Daisey Mae Blakney. None of the defendants took the stand in his or her defense.

At trial Abdella, one of the bank customers, identified Jenkins as the "floorman" in charge of the robbery. Another customer, John Leiss, first identified Wilcox as the floorman but then changed his identification to Jenkins after the prosecutor was permitted to show him, over objection, the photograph of Jenkins which he had previously picked out—first on September 19, 1972, and then again at a pretrial suppression hearing—from the spread of photographs shown to him. At the time of the trial Jenkins was clean shaven (although witnesses Mary Council and Corinne Shelly had described him as wearing a beard shortly before the robbery) and Wilcox was wearing a beard (although he had been clean shaven at the time of the robbery). Unlike Abdella and Leiss, Elmer Evans, a customer called by Jenkins, was unable to make any in-court identification and could not remember which photographs he had previously selected. Patton, a bank customer, was also unable to make any positive in-court identification of the floor-

man or any other robber, but he did say that the floorman looked like Wilcox did at trial.

Paul Green, who owned a store near the bank, was called as a witness by appellant Morrow. Green testified that he had seen only two Negro males outside the bank shortly before the robbery. When counsel for Jenkins offered to show that Green thought one of the men he had seen outside the bank looked like Wilcox, the district court excluded this evidence as unreliable, particularly in light of the fact that prior to trial Green had not been able to select a photograph of Wilcox from any of those shown to him.[1]

The jury found Jenkins, Wilcox, Hall, Bailey and Morrow guilty on all counts. Judge Newman granted a motion by Bailey for judgment of acquittal but denied similar motions by the others. Numerous claims of error are asserted on this appeal. We turn first to those asserted by all appellants.

*The Procedure Used to Select the Jury Panel*

Appellants contend they were denied a fair trial in New Haven because the procedure used to select the jury panel resulted in discrimination against Negroes. Under the district court's Plan for the Random Selection of Grand and Petit Jurors, adopted on June 21, 1968, in compliance with The Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 et seq. (the "Act" herein), the panel was selected from lists of registered voters in the New Haven division (New Haven, New London and Middlesex Counties). It is not claimed that there was any discrimination in the registra-

tion of voters or in the selection of the veniremen from the voter registration list. The claim is that discrimination resulted from the substantial disparity between the percentage of Negroes in the community and that on the jury source list. The percentage of Negroes among the adult population (i.e. aged 21 years or older) in the New Haven division is 5.45%, according to the United States Census. On the other hand, questionnaires sent out to members of the New Haven division jury pools from 1969 to 1973 revealed that only 3.3% were Negroes. It is this disparity of 2.-15% or ratio of roughly 5 to 3, which forms the basis of appellants' attack. They argue that it violates the Act and their constitutional rights, and that it should have been compensated for by selecting jurors from other sources. We disagree.

█ The objective of the Act is to secure a trial by a jury "selected at random from a fair cross section of the community," 28 U.S.C. § 1861, from which no citizen is excluded because of race or color, 28 U.S.C. § 1862. Recognizing that in most communities current lists of registered or actual voters would provide the best practical means of obtaining a fair cross-section, Congress provided that each plan might specify them as the primary tool to be used in the selection process, 28 U.S.C. § 1863(b)(2). However, since the voter lists might not always provide a fair cross-section, the plan was also required to specify other sources "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862."[2] The question before us is

---

1. After Green had selected two photographs which apparently no one in the bank at the time of the robbery had chosen, FBI agents showed him photographs of the five co-defendants, Jenkins, Wilcox, Hall, Bailey and Morrow and told him that those were the five persons who had committed the robbery.

2. 28 U.S.C. § 1863(b)(2) provides that the plan for random jury selection which each district court is required to devise "shall prescribe some other source or sources of

names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." Section 1861 declares in relevant part:

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."

whether the disparity in the present case was sufficient to mandate resort to a supplemental source. We think not.

■ We agree with appellants that, at least where color is involved, the Act goes "beyond prohibition of 'intentional' distortions and provides that in certain cases affirmative measures must be undertaken to insure that 'juries [are] selected at random from a fair cross section of the community . . .,'" see United States v. Fernandez, 480 F.2d 726, 733 (2d Cir. 1973). The legislative history of the statute makes clear, however, that in using the term "fair cross section of the community" Congress intended to permit "minor deviations from a fully accurate cross section." H.R. Rep. No. 1076, 90th Cong.2d Sess. (1968), reprinted in 1968 U.S.Code Cong. and Admin.News, pp. 1792, 1794. The House Report explained that:

> "The voting list need not perfectly mirror the percentage structure of the community. But any substantial percentage deviations must be corrected by the use of supplemental sources. Your committee would leave the definition of 'substantial' to the process of judicial decision."

■ In determining whether the disparity in the present case was substantial the district court, as one ground for its decision, held that since under-registration of Negroes is a national phenomenon the criterion should be whether the "Negro registration falls below White voter registration to an extent significantly greater than the national average." With this we must disagree. The Act, by referring specifically to the "community," established as the standard a fair cross section of the local community—in this case the New Haven division—not some national ratio.

■■ There remains the question of whether the substantiality of the disparity, judged by the "local community" standard, should be determined by (1)

the ratio of the Negro percentage of the adult population to the Negro percentage of those adults available for jury service under the district court's plan or (2) by the difference that would result in the absolute racial composition of the venire as a result of the under-registration of blacks as voters. Appellants contend that the former standard should be used, pointing to the 5 to 3 ratio, which by itself appears substantial indeed. Judge Newman, on the other hand, adopted the latter test, noting that a 6% to 3% disparity between the census figures and the voter registration figures for the community would add to an average array of 50 to 60 veniremen only one (1) additional Negro, which he found not to be substantial enough to deprive appellants of their constitutional or statutory rights. We agree.

■ The Act was not intended to require precise proportional representation of minority groups on grand or petit jury panels. See United States v. Fernandez, *supra,* 480 F.2d p. 733. Nor does the Constitution. See Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1944); United States v. Flynn, 216 F.2d 354, 388 (2nd Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955) (proportional representation "has never been a part of the Anglo-American jury system and, indeed, is repugnant to that system.") Carried to its logical conclusion appellants' argument would require that if the adult Negroes in a community constituted 1% of the population, but only ¼ of 1% were registered voters, the 4 to 1 disparity would deny a Negro a fair trial. This we must reject. Besides color, Congress, in enacting the 1968 Jury Selection and Service Act, designated race, religion, sex, national origin and economic status as "suspect categories." See 28 U.S.C. § 1862. Since disparities similar to the one presented here undoubtedly exist for

Section 1862 provides that:
"No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status."

at least one or more of the multitude of groups within these categories in virtually every federal district in the country, adoption of appellants' position would necessarily lead to total abandonment of voter registration lists as the primary tool for the selection of jurors. This would be contrary to both the language of the statute and its legislative history, which makes clear that Congress intended the voter registration lists to serve an important screening function by eliminating those individuals "who are either unqualified to vote or insufficiently interested in the world about them to do so." 1968 U.S.Code Cong. and Admin.News, pp. 1795–1796.

The test of fairness intended by Congress is the more practical one of the difference in absolute numbers rather than a difference in percentages. Judged by this standard, a difference of one (1) Negro in a panel of 60 jurors is not substantial. Cf. Smith v. Yeager, 465 F.2d 272, 279 n. 18 (3d Cir.), cert. denied, 409 U.S. 1076, 93 S.Ct. 685, 34 L.Ed.2d 665 (1972).

*The Sufficiency of the Evidence*

Three appellants—Jenkins, Hall and Morrow—urge with varying degrees of enthusiasm that the evidence was insufficient to permit a jury to find them guilty beyond a reasonable doubt. Viewing the evidence in the light most favorable to the government, as we are required to do, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. McCarthy, 473 F.2d 300, 302 (2d Cir. 1972); United States v. Ross, 464 F.2d 376 (2d Cir.), cert. denied, 410 U.S. 990, 93 S.Ct. 1507, 36 L.Ed.2d 188 (1972), we find their contentions to be without merit.

■ There was ample evidence to enable a jury rationally to reach a guilty verdict as to all appellants—indeed, so much so that a detailed, blow-by-blow description is hardly necessary. With respect to Jenkins the proof showed, among other things, that on the night before the robbery he met with Wilcox. Within a few hours before the robbery

he obtained at Mary Council's house the guns apparently used to commit it, departing with Hall in Jenkins' car as Wilcox and Morrow simultaneously left in Wilcox's car. He was identified by Abdella and Leiss, two bank customers present at the robbery, as one of the robbers. Abdella described him as wearing at that time a shiny brown jacket and brown felt hat. A similar jacket, with one gold button missing, and hat were found in Daisy Mae Blakney's garage on the day after the robbery. The missing gold button was found in the abandoned getaway car. Corinne Shelly testified that on the afternoon of the robbery Jenkins admitted having committed it and gave her a description. In short, while there was some conflicting evidence, much of which the jury was entitled to reject, the evidence of Jenkins' guilt was overwhelming.

■ Turning to Hall, the picture is similar. Shortly before the robbery Hall waited outside Mary Council's house while Jenkins obtained the necessary guns. He then departed with Jenkins. Immediately after the robbery he arrived with Wilcox, Morrow and Bailey at Blakney's house, 42A Virginia Avenue, where they were soon joined by Jenkins. At that time Hall had the white handle of a gun protruding from his belt, from which the jury might infer it was one of the guns obtained earlier by Jenkins for the robbery. A similar gun was found in the Blakney garage. Hall's telltale fingerprint was later found on the inside rear view mirror of the stolen getaway car. When Hall was arrested on September 21, 1972, in North Carolina he gave a false exculpatory statement to the effect that he had been in Glassboro, New Jersey, on the day of the robbery, from which the jury was entitled to infer a consciousness of guilt. Mikus v. United States, 433 F.2d 719, 728 (2d Cir. 1970). Hall's wife, two days after the robbery, purchased the used Eldorado for $2,199 cash, even though prior to the robbery Hall and his wife appeared to be living under condi-

tions apparently inconsistent with possession of any wealth, all of which the jury was entitled to consider, see United States v. Crisp, 435 F.2d 354, 360 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). Lastly, one of the mutilated bills stolen in the robbery was found in the trunk of the Eldorado, with Hall standing nearby.

Morrow, like Wilcox and Hall, had never been in Danbury until shortly before the robbery and she was not seen again in Danbury after the date of of the robbery. Furthermore Morrow, weaing slacks, was observed with Jenkins, Wilcox and Hall on the morning of the robbery and her fingerprint was found on the paper bag left by the robbers in the bank. There was testimony from which the jury could have concluded that the paper bag left behind by the robbers was the same paper bag which one of the robbers acquired just minutes before the robbery when he purchased a can of spray paint in Grant's Department Store.[3] Bank manager Setaro and bank customers Evans and Leiss all testified that one of the robbers was a Negro female, and there was evidence that she wore slacks.

From all the foregoing, the jury could infer beyond a reasonable doubt that Jenkins, Hall and Morrow were each active participants with Wilcox in the bank robbery. See United States v. Wisniewski, 478 F.2d 274 (2d Cir. 1973); United States v. Bottone, 365 F.2d 389, 392 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966) ("[t]he trier is entitled, in fact bound, to consider the evidence as a whole; and, in law as in life, the effect of this generally is much greater than of

the sum of the parts"). Morrow argues that the trial court should have instructed the jury not to consider the hearsay acts and declarations of Jenkins as evidence against her until they had found beyond a reasonable doubt that Jenkins and she had been engaged in a joint venture. Clearly, however, the court was not required to depart from the "fair preponderance of the evidence test" which we have repeatedly held sufficient in conspiracy cases. See United States v. Projansky, 465 F.2d 123 (2d Cir.), cert. denied, 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). Nor do we agree with Wilcox that the trial court did not make it sufficiently clear in the charge that the jury could not find Wilcox guilty of bank robbery solely on account of his possession of stolen money. Judge Newman charged the jury:

> "If you find there has not been a satisfactory explanation (for Wilcox's possession of the stolen money), then proceed to consider whether, *from all the evidence in the case,* you wish to draw the inference from the fact of possession that defendant Wilcox participated in the robbery. . . . [B]ut the inference even if drawn by you, would not establish guilt on each count." (Emphasis added.)

### The Refusal to Sever Jenkins and Wilcox

Jenkins and Wilcox both claim they were prejudiced by the district court's repeated refusals to sever their trials pursuant to Rule 14, F.R.Cr. P.,[4] when it became apparent, during the eyewitness testimony of Abdella, Leiss and Evans, that each appellant might try to point to the other as the "floorman" during the robbery. In consider-

---

3. Sandra Rodriguez, a salesgirl for Grant's, which is located in the same shopping center as the Hayestown Avenue Branch of the Union Trust Company, testified that at approximately 10:05 A.M. on the day of the robbery she sold a can of black spray paint to a tall Negro male. She testified further that her normal procedure when making such sales was to put the item sold in a brown paper bag.

4. Rule 14 provides:
 "If it appears that a defendant . . . is prejudiced by a joinder of offenses . . . in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

ing their claims we are guided by the principle that the trial court enjoys a wide discretion in the matter of granting or denying separate trials for defendants jointly charged and its decision will be set aside only upon a clear showing of abuse of discretion. United States v. Projansky, *supra* 465 F.2d at 138 (2d Cir.). This burden is not satisfied by the existence of a mere inconsistency in separate defenses, provided there is an evidentiary basis enabling the jury to decide each defendant's case separately. United States v. Addonizio, 451 F.2d 49, 63 (3d Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812, rehearing denied, 405 U.S. 1048, 92 S.Ct. 1309, 31 L.Ed.2d 591 (1972).

## A. *Jenkins*

■ Jenkins points to only one instance where Wilcox or any of his other co-defendants were permitted to implicate him before the jury as the floorman. After customer Leiss, in response to government questioning, had repudiated his wholly unanticipated in-court misidentification of Wilcox and then firmly identified Jenkins, counsel for both Wilcox and Morrow had Leiss repeat this identification of Jenkins. The possibility of prejudice from this episode strikes us as entirely too remote and speculative to mandate a severance. Leiss' repetition of his identification added little to his unequivocal and firm identification of Jenkins as the floorman and his testimony that Wilcox was not the man he saw in the bank. The chance of harm to Jenkins hardly approximates the very real prejudice shown in cases relied upon by him, e. g., where one co-defendant confesses and directly incriminates or contradicts another in front of the jury. Compare United States v. Johnson, 478 F.2d 1129 (5th Cir. 1973) with United States v. Harris, 458 F.2d 670 (5th Cir.), cert. denied, sub nom. Scott v. United States, 409 U. S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972).

Judge Newman refused to permit Jenkins on his cross-examination of Paul Green, who had been called as Morrow's witness, to introduce testimony that one of the two Negro males seen by Green outside of the bank shortly before the robbery looked like Wilcox. But the exclusion of this testimony caused no appreciable prejudice to Jenkins. Green's less than positive identification of Wilcox as being outside the bank hardly suggested that Wilcox was actually the floorman during the robbery inside the bank. At most the testimony would have merely bolstered the government's theory that *both* Wilcox and Jenkins were present during the robbery.

■ The trial court's refusal to permit Jenkins, after eliciting from Elmer Evans, a bank customer called by him, that Evans could not recall which photographs had been selected by him from a spread seen shortly after the robbery, to introduce testimony of Agent Batt concerning the photographic selections made by Evans, raises a more serious question. Evans, unlike Green, was in the bank during the robbery, and, at the time he made the selections, Evans was attempting, like Abdella and Leiss, to identify the floorman during the robbery. Evans' prior photographic identification of Wilcox and his non-identification of Jenkins' photo might have been helpful to Jenkins, not as an impeachment of Evans, who was bereft of any recollection on the issue, but as affirmative evidence contradicting the in-court identifications of Jenkins as the floorman by Abdella and Leiss. However, a formidable stumbling block as to the admissibility of Evans' photographic identification of Wilcox arises from the fact that it clearly was hearsay, since it was never made under oath or subject to cross-examination. See 5 J. Wigmore, Evidence §§ 1361, 1362 (3d ed. 1940).

It is true that we have been rather liberal in admitting a witness' prior photographic identification as affirmative evidence, at least where the witness could not presently make an identification. See, e. g., United States v. De-Sisto, 329 F.2d 929, 932–934 (2d Cir.

1964), cert. denied, 377 U.S. 979, 84 S. Ct. 1885, 12 L.Ed.2d 747 (1964); United States v. Cunningham, 446 F.2d 194, 197–198 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971). But in each case where this has been permitted the requirements of the hearsay rule, while perhaps stretched a bit, were satisfied. In *DeSisto*, for instance, the prior identifications were either made under oath and subject to cross-examination or were adopted by testimony subject to those safeguards on "which our law places primary reliance for the ascertainment of truth." 329 F. 2d at 934. None of these conditions existed here. Evans' photographic identification of Wilcox was made initially five days after the robbery in Evans' own office with no defense counsel present and it was never repeated, either before the grand jury, at the pretrial suppression hearing or at appellants' trial. Under these circumstances requiring the admission, through testimony of Agent Batt, of Evans' prior photographic identification would depart farther from the traditional hearsay principle than we have yet gone. See United States v. Cunningham, 446 F.2d 194, 197–198 (2d Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 302, 30 L.Ed.2d 266 (1971); United States v. Mingoia, 424 F.2d 710, 713 (2d Cir. 1970); United States v. Insana, 423 F.2d 1165, 1170 (2d Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970).

Even if the rule regarding admissibility of prior identification should be further liberalized, see McCormick, Evidence § 251 at 603 (Cleary ed. 1972), this would hardly be the case in which to do it. Judge Newman was clearly acting within his discretion in excluding Batt's testimony, in view of Evans' lack of any motivation to fake loss of memory and in light of the apparent conflict between testimony given by Evans and Batt outside of the jury's presence as to exactly what earlier photographic identification had been made by Evans. See

United States v. Insana, *supra*, 423 F.2d at 1170. Batt testified that Evans had selected two photos, one of Wilcox and the other of one James Sims, as the "floorman," with Evans indicating a slight preference for Wilcox's photo. Evans, on the other hand, testified that he had selected two photos resembling two different robbers rather than one of the robbers. The confusion thus engendered underscores the wisdom of adhering to the traditional rule, in this case at least. In any event it is apparent that the admission of Batt's testimony would not help Jenkins very much and that an insufficient showing of prejudice from its exclusion has been made.

Nor is this a case like Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), where the Supreme Court reversed a criminal conviction because the trial court had refused to admit testimony by three different persons that a man named McDonald had previously confessed to the murder with which Chambers was charged. In *Chambers* the hearsay confessions of McDonald were "originally made . . . under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S.Ct. at 1048. The three different spontaneous oral confessions made by McDonald to close acquaintances, being declarations against penal (although not against pecuniary) interest, would probably have been admissible in some jurisdictions under an exception to the hearsay rule for such declarations, see 410 U.S. at 299 n. 17, 93 S.Ct. 1038. Moreover each of the three confessions was corroborated by other evidence, including a confession in writing signed by McDonald and the testimony of an eyewitness to the killing. Here, in contrast, there was little reason to credit Evans' prior out-of-court photographic identification of Wilcox, especially since Evans was unable to repeat it at trial and Agent Batt testified on voir dire that Evans was somewhat equivocal in making his

identification.[5] The level of certainty demonstrated by a witness is clearly one factor to consider in assessing the reliability of his confession. See Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ In excluding entirely Agent Batt's testimony concerning the prior photographic selections made by Evans, Judge Newman conceded that he might have admitted this testimony—at least as to Evans' failure to select the photograph of Jenkins included in the spread shown to him—in a separate trial of Jenkins.[6] In a separate trial, however, Jenkins would have had no due process right to introduce the testimony of Agent Batt regarding the prior identification by Evans, cf. Chambers v. Mississippi, *supra*. We cannot say that the mere loss of the possible privilege of presenting normally *inadmissible* hearsay in a separate trial evidences prejudice of a type mandating severance of a joint trial under Rule 14, F.R.Cr.P. Cf. Byrd v. Wainwright, 428 F.2d 1017, 1022 and n. 8 (5th Cir. 1970) (where the exculpatory testimony was *admissible* as of right in a separate trial).

■ Jenkins next claims prejudice by reason of the trial court's redaction of Corinne Shelly's pretrial statement concerning Jenkins' admission of guilt to her, from which Judge Newman edited out Shelly's report of incriminating references by Jenkins to his co-defendants. According to the statement, which was given to federal agents on September 20, 1972, Jenkins first replied to Shelly's inquiries about the bank robbery that he had "helped rob the bank," and then later suggested that the persons he had helped were "Nasty [Wilcox] and his friends." Judge Newman's redaction of any reference to Wilcox or the other co-defendants was proper in the context of the joint trial, see Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and did not limit in the least the ability of Jenkins' counsel to cross-examine Shelly concerning her in-court recitation of this admission.[7] Indeed the redacted portions probably would have hurt Jenkins more than they would have helped him since they suggested that Jenkins and Wilcox were in the robbery together, thus undercutting Jenkins' efforts to persuade the jury that he was not involved at all.

■ Finally, we find no merit in Jenkins' "spillover" argument. This is not a case in which weak evidence against one party may have been strengthened in the jury's mind by admission of convincing evidence against a co-defendant. See, e. g., United States v. Magnotti, 51 F.R.D. 1 (D.Conn.1970). Standing alone the independent evidence against Jenkins was strong. Nor is this a case where one defendant has been named in only one or two counts of a multicount indictment against others. See United States v. Branker, 395 F.2d 881 (2d Cir.), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1968); United States v. Kelly, 349 F. 2d 720 (2d Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). Jenkins was named in all three counts of the indictment. Under such

---

5. Batt testified on voir dire:
"Mr. Evans selected two photographs. He indicated in some manner to some degree that he favored the photograph of Mr. Wilcox. As I recall, it wasn't much of a preference for Mr. Wilcox's photograph, but it was—there was some preference of Wilcox's photograph over Sim's photograph."

6. Under the circumstances of the joint trial even the more limited offer that Evans did not pick Jenkins would have implicated Wilcox since after this offer was made all the other defendants—except Wilcox—would have insisted on showing that their photographs were also included in the spread shown Evans and he did not pick them either. In the end Wilcox would have been condemned by his silence.

7. Before overruling counsel's objection to the redaction, the district court gave counsel every opportunity, during voir dire with Shelly present and available for questioning, to show what additional use of the redacted portions of the pretrial statement he could make.

circumstances denial of a severance was not an abuse of discretion. See United States v. Garber, 413 F.2d 284 (2d Cir. 1969) (motion for severance is "addressed to the discretion of the trial judge"); Application of Gottesman, 332 F.2d 975, 976 (2d Cir. 1964).

## B. *Wilcox*

 Like Jenkins, Wilcox can point to only one specific instance where his co-defendant was permitted to bring out or refer, in front of the jury, to evidence suggesting Wilcox's participation in the robbery. During his summation, Jenkins' counsel reminded the jury that bank customer Leiss had first identified Wilcox as the floorman during the robbery before changing his identification to Jenkins. Viewed in context, however, this reminder was not so much to suggest that Leiss truly believed Wilcox was the floorman as that Leiss was unsure of his identification of Jenkins as the floorman and had simply missed his cue in trying to follow the government's lead.[8] Considered in this light, Wilcox can hardly claim prejudice from this reminder, particularly since he did not object to it at the time it was made. United States v. Indiviglio, 352 F.2d 276 (2d Cir.), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1965).

We agree that Leiss probably would not have been called at all by the government in a separate trial of Wilcox. However, the government prosecutor expected Leiss to identify Jenkins only and was taken by surprise when Leiss first identified Wilcox as the floorman during the robbery. But any prejudice to Wilcox from this initial misidentification was sufficiently erased by Leiss' subsequent unequivocal correction of his testimony. After his initial mistake, Leiss insisted that Wilcox was *not* the man he saw standing in the middle of the bank, which might even have suggested to the jury that Wilcox was not in the bank at

all. Thus, in the end, Wilcox was possibly helped rather than hurt by Leiss' mistake.

 Lastly, Wilcox contends that he was prejudiced by the spontaneous testimony of John Patton, a bank customer, to the effect that Wilcox looked like a robber he had seen in the bank. However this testimony hardly required a separate trial since in such a trial the government would have been entitled to call Patton as an eyewitness to give a general description of some of the participants in the robbery and his observation of the license number of the getaway car, later found near the home of Daisy Mae Blakney where Chief Tallon and Agent O'Neil saw Wilcox shortly after the robbery. Thus the questioning of Patton at a separate trial would have proceeded along substantially the same lines and no prejudice from the joint trial, as distinguished from a separate trial, is shown.

## *The Denial of the Motions to Suppress*

Jenkins and Wilcox argue that the district court erred in not suppressing, prior to trial, the incriminating evidence seized from the Blakney house at 42A Virginia Avenue on the day following the robbery, which included the pearl handled gun, bullets, can of black enamel spray paint, jacket, hat and gold button. Wilcox insists that the court should also have suppressed the "bait money" seized without a warrant on October 24, 1972, from his personal effects held for "safekeeping" at the New Jersey jailhouse.

## A. *The Seizures at the Blakney House*

The search of the Blakney house on the day after the robbery was made pursuant to a warrant based in part on Agent O'Neil's observation in the house during the previous afternoon of a shotgun and a shopping bag resembling a bag carried by the robbers, after Frances Gary had consented to their en-

---

8. Thus counsel for Jenkins argued on summation that the reason for the change in Leiss' identification was that Leiss subsequently remembered during a weekend break in the trial that he was "supposed to pick out the defendant Jenkins."

try. Jenkins and Wilcox argue that the search went far beyond the scope of the consent given by Gary. However, Gary herself testified that O'Neil and Tallon asked her if they could look "around" and she freely responded: "Look any place you want to look." O'Neil entered Gary's back bedroom (where he observed the shopping bag) only because one of the men with whom he was talking in the kitchen went in there. Thereafter O'Neil entered the front bedroom (where he observed the shotgun without moving or opening anything) only after Gary had given him permission to use the telephone in this room.

 Jenkins and Wilcox do not seriously question Gary's authority to consent to a search of the entire premises. Indeed Judge Newman found that Gary had "complete access to the entire [first floor] premises consisting only of four rooms." In light of this uncontradicted finding Jenkins and Wilcox, in making use of the Blakney home, clearly assumed the risk that Frances Gary, a joint tenant for all practical purposes, would permit police officers to enter any part of it. See United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L. Ed.2d 242 (1974); Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1963); United States v. Cataldo, 433 F.2d 38, 40 (2d Cir. 1970), cert. denied, 401 U.S. 977, 91 S.Ct. 1200, 28 L. Ed.2d 326 (1971).

B. *The Seizure of the "Bait Money"*

Wilcox argues further that his arrest was unlawful and that therefore the "bait money" taken eight days later from his personal effects at the New Jersey jailhouse should have been suppressed as the fruit of this unlawful arrest, see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In the alternative, he contends that even if his initial arrest was lawful, the money should have been suppressed because the search and seizure was not incident to his arrest and was made without a warrant.

The background of the arrest was that on October 15, 1972, one month after the robbery, a New Jersey state trooper patrolling Route 1, south of New Brunswick, stopped Wilcox, whom he observed to be riding a motorcycle bearing only paper license plates, and asked him for his license and registration. Wilcox produced only a driver's license in the name of William Fuller and a bill of sale for the motorcycle made out to James Bailey. The trooper then searched the motorcycle, discovered a pistol in the motorcycle's saddlebag, and placed Wilcox under arrest for carrying a concealed weapon.

 Wilcox argues that this arrest was unlawful since the warrantless saddlebag search far exceeded the permissible scope of searches incident to routine traffic stops. The argument is undermined by the Supreme Court's recent decision in United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed. 2d 427 (1973), reversing the Court of Appeals' decision, 471 F.2d 1082 (D.C. Cir. 1972), so heavily relied upon by Wilcox, and upholding, under substantially similar circumstances, a search incident to the arrest of a person for driving without a valid license. See, also, Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). The present case is even stronger than *Robinson,* since it involves more than a routine traffic arrest. Furthermore, in the present case we are not dealing merely with a routine traffic arrest. Here there was probable cause to believe that the motorcycle was stolen, since it carried only cardboard license plates and Wilcox could not produce any registration certificate or identify the owner. These circumstances justified a search. In arguing that the district court erred in upholding the search in the absence of evidence that the trooper in fact believed that the motorcycle was stolen, Wilcox ignores the settled rule that in judging the legality of a search, courts must apply an objective standard and will not be bound by the subjective "beliefs of the arresting officer [or] the

Assistant United States Attorney at trial." United States v. Tramontana, 460 F.2d 464, 466 (2d Cir. 1972); Ralph v. Pepersack, 335 F.2d 128, 132–134 (4th Cir. 1964). Here the facts and circumstances known to the state trooper prior to the search of the motorcycle saddlebags were sufficient to warrant "a man of reasonable caution in the belief" that the motorcycle was stolen, see Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

▮ Thus the trooper could have lawfully arrested Wilcox for this crime and then searched the motorcycle saddlebag, which was within grabbing distance, as incident to this arrest. Cf. Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The mere fact that the trooper reversed the procedure, conducting the search before the arrest, did not render it illegal as long as probable cause to arrest existed at the time of the search. See United States v. Riggs, 474 F.2d 699, 704 (2d Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 820 (1973) ("postponement of the further intrusion of arrest does not remove the justification for the search and in no way prejudices the individual's Fourth Amendment rights"); Busby v. United States, 296 F.2d 328, 332 (9th Cir.), cert. denied, 369 U.S. 876, 82 S.Ct. 1147, 8 L.Ed.2d 278 (1961) ("Once there is probable cause for an arrest without a warrant it is immaterial that a search precedes the arrest."). Any other holding would, without rational basis, exalt form over substance. Since the initial search and arrest of Wilcox was lawful, his argument that the inspection and seizure of the "bait money" at the jailhouse was the fruit of a primary illegality must therefore fail.

Wilcox next argues that even if his arrest was lawful the events which followed at the jail precluded further inspection of the money. Following his arrest Wilcox was booked at a nearby police station and incarcerated on a concealed weapons charge. His clothing and a wallet containing several bills were taken from him, inventoried and given to the jailor for safekeeping. The money was placed in an envelope and locked in a jail safe apart from Wilcox's other belongings. About a week later, on October 23, 1972, a federal agent was granted permission by the police captain in charge to view the money taken from Wilcox and discovered that the serial numbers on 11 five-dollar bills included in the sum were the same as serial numbers on certain of the "bait money" taken from the Union Trust Company in the robbery. These bills were seized without a warrant on the next day, October 24, 1972.

▮ Wilcox contends that the "second look" at and warrantless seizure of the money by the agent violated his constitutional rights. However, the content must be rejected, in view of the Supreme Court's recent decision in United States v. Edwards, 415 U.S. 800, 94 S. Ct. 1234, 39 L.Ed.2d 771 (1974), upholding a warrantless search and seizure of the defendant's clothing while he was lodged in a local jail after arrest and stating that such a seizure is permissible "where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail and at a later time searched and taken for use at the subsequent criminal trial." 415 U.S. at 807, 94 S.Ct. at 1239. This argument ignores the fact that once the money had been lawfully taken by the police for safekeeping Wilcox no longer could reasonably expect any right of privacy with respect to the serial numbers, see Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The contention has been squarely rejected by the Ninth Circuit in Westover v. United States, 394 F.2d 164 (9th Cir. 1968), cited with approval by the Supreme Court in United States v. Edwards, *supra* at 415 U.S. 804, 807, 94 S.Ct. 1234, where the court said:

"[I]t appears that taking a prisoner's money from him and putting it in the property room was regular jail procedure for all prisoners. . . . In

taking the money, no one would suggest that at that instant a search warrant would be required to list the numbers on the bills. Thus, a search warrant to again look at the money already in police custody does not make sense." 394 F.2d at 165.

Wilcox would distinguish *Westover* on the grounds that the money in those cases was the fruit of the crime for which the arrests were made—bank robbery—and thus was subject to warrantless seizure and inspection at the time of the arrests whereas here the money had nothing to do with the crime for which Wilcox was arrested—carrying a concealed weapon—and, at the time of Wilcox's arrest, was not subject to anything more than what the jailkeeper actually did with it, i. e., place it in a safe in the jailhouse. However, this distinction has no legal significance. For all practical purposes the serial numbers on bills would in both cases be fully exposed to police view, whether the money were seized as the fruit of a crime or were simply taken from the prisoner's wallet at the time of his arrest and placed in an envelope in the jail safe for "safe keeping." Under either circumstances it cannot be said that the "second look" amounts to an intrusion into an area where the owner could any longer reasonably expect privacy.

Brett v. United States, 412 F.2d 401 (5th Cir. 1969), upon which Wilcox relies, is clearly distinguishable. There the Fifth Circuit, holding unlawful a warrantless search through the pockets of a prisoner's personal clothing and seizure of items, pointed out that the facts before it were quite different from those in *Westover* where the property inspected and seized—the prisoner's money—had been fully exposed at the time of its initial taking. Since *Brett*, like Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 91 L.Ed.2d 777 (1964) (vehicle search), another case relied on by Wilcox, involved a traditional "search" of an area that the defendant could reasonably expect would remain inviolate in the absence of a warrant or

exigent circumstances, the court's decision in that case is wholly consistent with the position taken by us here. No reasonable expectations of privacy were invaded and no search occurred when the police officers in this case simply looked again at what they had already—lawfully—seen. Cf. Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L. Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed. 2d 726 (1962) (Clark, J.) (no search occurs where police officer simply views what has been exposed to his view).

### The Admission of Leiss' Prior Photographic Identification of Jenkins

■ Jenkins argues that the government should not have been permitted, after Leiss had identified Wilcox as the floorman to show Leiss a photograph of Jenkins which had been selected by Leiss five days after the robbery and again at a suppression hearing, and then to ask Leiss to make a new in-court identification. However, we have sanctioned this procedure under nearly identical circumstances, United States v. DeSisto, 329 F.2d 929, 932–934 (2d Cir.), cert. denied, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), admitting the prior identification as affirmative evidence, since it had been given under oath and subject to cross-examination. No reason is offered for not following *DeSisto* here, where Leiss, unlike Evans, was subject to meaningful cross-examination concerning his prior photographic identification. See also United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Nor do we think that the rehabilitation of Leiss gave rise to a "very substantial likelihood" that Leiss' ultimate in-court identification of Jenkins was mistaken, see Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), since Leiss' final in-court identification was consistent with his prior identifications, which are not claimed to have been "suggestive." Leiss testified

that during the robbery he looked directly at the floorman for at least two minutes and that at one point during this time he was no more than an arm's length from the floorman who pushed him. In view of the "totality of [these] circumstances," Leiss' unequivocal new identification, following correction of his misidentification, was sufficiently reliable to be admitted and tested by cross-examination. See Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L. Ed.2d 401 (1973).

### The Consolidation of the Charge Against Morrow

In granting the government's motion for consolidation of the information against Morrow as a juvenile delinquent, see 18 U.S.C. §§ 5031, 5032, with the indictment against the four adult defendants the district court recognized that Rule 13, F.R.Cr.P., permits consolidation for trial of indictments or informations only if all the defendants could have been joined in a single indictment or information,[9] a situation not met here since the adult defendants had not waived their right to be prosecuted by indictment, see Rule 7, F.R.Cr.P.,[10] and the juvenile Morrow had chosen to be prosecuted as a juvenile, i. e., by information only. See 18 U.S.C. § 5032.[11] Relying on our decision in United States v. Williams, 459 F.2d 903 (2d Cir. 1972), however, the district court reasoned that even where a juvenile chooses to be prosecuted as a juvenile, he or she could still have been prosecuted on an indictment as long as the right to be sentenced as a juvenile, see 18 U.S.C. § 5034,[12] is preserved.

█ The district court's reliance on *Williams* is misplaced. In that case an eligible juvenile was prosecuted as an adult when he failed to consent to prosecution as a juvenile. We reversed the resulting felony conviction with directions to expunge the indictment from the records, finding insufficient evidence that the defendant had been fully informed upon arraignment of all his rights as a juvenile. Since the criminal process employed against Williams did not prejudice his right to a fair determination of his guilt, and under the current practice in the district courts in this circuit, the guilt determining process was the same as if he had elected juvenile treatment,[13] we remanded for

---

9. Rule 13 provides:
 "The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."

10. Rule 7 provides:
 "An offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment or, if indictment is waived, it may be prosecuted by information."

11. 18 U.S.C. § 5032 provides:
 "A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise.

 "In such event the juvenile shall be proceeded against by information and no criminal prosecution shall be instituted for the alleged violation."

12. 18 U.S.C. § 5034 provides:
 "If the court finds a juvenile to be a delinquent, it may place him on probation for a period not exceeding his minority, or commit him to the custody of the Attorney General for a like period."

13. As in *Williams*, we need not decide whether McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), has overruled the decision of a three-judge court in this circuit holding that a juvenile in a federal proceeding cannot be required to waive his right to a jury trial in order to receive treatment as a juvenile, Nieves v. United States, 280 F.Supp. 994 (S.D.N.Y. 1968). Several other circuit courts have disagreed with the result in Nieves. See United States v. Salcido-Medina, 483 F.2d 162 (9th Cir. 1973), cert. denied, 414 U.S. 1070, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973); United States v. King, 482 F.2d 454 (6th

resentencing only rather than for a new trial on an information. As our direction to expunge the indictment indicated, however, this disposition did not imply that the statutory provision providing for prosecution of consenting juveniles by information only, see 18 U.S.C. § 5032, could be ignored as long as the defendant, upon conviction, was sentenced as a juvenile.

Regardless of the impropriety of the consolidation we fail to see that it caused Morrow any prejudice. At no time did she waive her right to a jury trial or express any wish to exercise her option under 18 U.S.C. § 5033 to be tried by the court alone "in chambers or otherwise."[14] Thus the "guilt determining process" for Morrow was the same as it would have been without the consolidation. See United States v. Williams, *supra*. Furthermore, Morrow received no punishment which she would not have received without the consolidation. Except in one respect, therefore, which we note below, she gained all the advantages which the Federal Juvenile Delinquency Act was designed to preserve for persons in her position. The one deficiency was minor and remediable. After reciting that Morrow had been convicted of "violation of Title 18, Section 2113(a), 2113(b), 2113(d) and 2(a) and 2(b)," the district court's judgment, entered after the jury verdict, stated: "It is adjudged that the defendant is guilty as charged and convicted." Since the judgment thus failed to include a finding of delinquency as required by 18 U.S.C. § 5034, it would appear on its face to be a criminal judgment usable against her, contrary to the clear mandate of the Juvenile Delinquency Act, as prior conviction. See United States v. Williams, *supra*; Cotton v. United States, 355 F.2d 480 (10th Cir. 1966); Fagerstrom v. United States,

311 F.2d 717 (8th Cir. 1963). This omission of a specific finding of delinquency, however, is harmless in view of the language in the rest of the judgment sentencing Morrow, pursuant to the penalty provision of the Juvenile Delinquency Act, 18 U.S.C. § 5034, to the custody of the Attorney General "for the period of her minority." Nevertheless we will remand the judgment against Morrow to the district court so that its form may be made to comply with 18 U.S.C. § 5034.

We find no merit in the other contentions made by appellants, which have been carefully considered.

The judgments of the district court against appellants Richard Jenkins, Norman Wilcox and Donald Hall are affirmed. The judgment of the district court against appellant Lynn Morrow is remanded so that its form may be made to comply with 18 U.S.C. § 5034.

---

Cir. 1973); United States v. James, 464 F. 2d 1228 (9th Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 697, 34 L.Ed.2d 675 (1972); Cotton v. United States, 446 F.2d 107 (8th Cir. 1971). In this case, no one has protested the fact that Morrow was accorded a jury trial.

14. 18 U.S.C. § 5033 provides:
"District Courts of the United States shall have jurisdiction of proceedings against juvenile delinquents. For such purposes, the court may be convened at any time and place within the district, in chambers or otherwise. The proceeding shall be without a jury."