Michael ALSTON, Petitioner,

v.

Raymond LOPES, Respondent.

James HASKINS, Petitioner,

v.

Raymond LOPES, Respondent.

Civ. Nos. B–83–464(TFGD), B–82–1006(TFGD).

United States District Court, D. Connecticut.

Nov. 5, 1985.

David N. Rosen, New Haven, Conn., for petitioner Alston.

John R. Williams, New Haven, Conn., for petitioner Haskins.

Arnold Markle, State's Atty., Julia Dewey, Ass't State's Atty., New Haven, Conn., for respondent.

## RULING ON PETITIONS FOR WRITS OF HABEAS CORPUS

DALY, Chief Judge.

Petitioners Michael Alston and James Haskins were arrested in New Haven on May 3, 1974 in connection with the armed robbery of a New Haven Savings Bank branch. Petitioners were later tried and convicted of armed robbery in United States District Court and each received twenty-five year sentences. Petitioners then were brought to trial in Connecticut Superior Court on state assault charges for the shooting of two New Haven police officers which occurred as petitioners attempted to evade police custody following the robbery. Both petitioners were convicted and, on appeal to the Connecticut Supreme Court, the convictions were affirmed. *State v. Haskins*, 188 Conn. 432, 450 A.2d 828 (1982).

■ After having exhausted their state remedies,[1] petitioners applied to this Court for writs of habeas corpus. Petitioners challenge the jury selection system in New Haven County on grounds that the exclusion or underrepresentation of various groups violated their constitutional rights under the Sixth and Fourteenth Amendments. Petitioners claim that Blacks, women, students, indigents, certain age groups, persons with low levels of education, felons, those who expressed a dis-

---

1. While neither party has raised the exhaustion issue, the Court notes that both Alston and Haskins have exhausted their available state remedies in challenging the jury selection process on equal protection grounds. The exhaustion doctrine, codified in 28 U.S.C. § 2254(b), "is rooted in a policy of federal-state comity by giving the state the initial opportunity to pass upon and correct alleged violations of its prisoners' federal constitutional rights." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir.1981) (citing *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)). The Supreme Court of Connecticut, however, refused to address petitioner Haskins' equal protection claim, because it had not been fully briefed and therefore was considered abandoned. *State v. Haskins*, 188 Conn. 432, 469, 450 A.2d 828, 848–849 (1982). This Court nevertheless finds that the Connecticut Supreme Court had ample opportunity and sufficient facts before it to address both petitioners' equal protection claims.

The exhaustion doctrine requires that a state defendant "fairly present" his federal constitutional claim to the state courts before seeking habeas relief. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). The defendant need not cite chapter and verse of the Constitution to satisfy this requirement, but rather can do so by:
(a) relying on pertinent federal cases employing constitutional analysis,
(b) relying on state cases employing constitutional analysis in like fact situations,
(c) asserting his claim in terms so particular as to call to mind a specific right protected by the Constitution, or
(d) alleging a pattern of facts that is well within the mainstream of constitutional litigation.
*Daye v. Attorney General of State of New York*, 696 F.2d 186, 194 (2d Cir.1982), *followed in Cousart v. Hammock*, 745 F.2d 776 (2d Cir. 1984). Indeed, "explicit labeling is not a *sine qua non* of exhaustion." *Id.* at 195. Rather, the requirement may be satisfied if the defendant's state brief contains both a factual basis for his claim and such words as "under the due process clause" or "under the Constitution." *Klein v. Harris*, 667 F.2d at 282. Under these circumstances, the state court would surely have notice of the constitutional claim the defendant raises and is free to request further briefing from the parties if it feels briefing is appropriate or if it is otherwise dissatisfied with the legal arguments presented to date.

In the present case, both Alston's and Haskins' briefs provided ample language so as to alert the Connecticut Supreme Court to the equal protection challenge to the jury selection process. As the Connecticut Supreme Court noted, petitioner Alston's state court brief includes a point heading challenging the composition and selection of the jury array under the due process clause and the *equal protection* clause. *State v. Haskins*, 188 Conn. at 469, 450 A.2d at 848, 849 (referring to Brief for Defendant Alston at 18). Additionally, Alston relies on pertinent federal precedent by citing to *Castaneda v. Partida*, 430 U.S. 482, 494, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), which sets forth the elements of a *prima facie* equal protection challenge to a jury selection process. Brief for Defendant Alston at 20.

Petitioner Haskins, as well, cites to *Castaneda*, Reply Brief for Defendant Haskins at 2, and goes a step further to adopt the arguments and claims of his co-defendants. Brief for Defendant Haskins at 233. So doing, Haskins also provided sufficient notice to the Connecticut Supreme Court of an equal protection claim. Finally, petitioners' state court briefs are replete with facts sufficient to support an equal protection claim. This Court therefore finds that in light of the Second Circuit's standard for exhaustion the petitioners' briefs provide ample evidence of exhaustion in this case.

satisfaction with the United States government, and those engaged in certain occupations were either unconstitutionally excluded or substantially underrepresented on the jury arrays. In addition to their jury selection claims, the petitioners allege a denial of constitutional rights resulting from the exclusion of certain identification testimony, limitations placed on cross-examination, and the trial court's refusal to allow the questioning of jurors concerning the possible influences of pre-trial publicity. The Connecticut Supreme Court dismissed all of the petitioners' claims and affirmed the convictions. *State v. Haskins*, 188 Conn. 432, 450 A.2d 828 (1982). Since the Court finds the underrepresentation of Blacks caused by the jury selection system violated the equal protection clause of the Fourteenth Amendment, only the petitioners' jury selection claims will be addressed.

*Jury Selection Claims*

Petitioners claim that the Connecticut jury selection procedure, as prescribed by former Connecticut General Statutes Section 51–220, caused a substantial underrepresentation of Blacks on the New Haven County jury array, thereby depriving them of equal protection of the laws in violation of the Fourteenth Amendment. In support of their claim, the petitioners have introduced evidence at a hearing before the Court consisting of a statistical analysis of the claimed underrepresentation caused by section 51–220.

The Connecticut statute in question assigns towns falling within a specified population range a fixed quota of jurors that each town must fill in supplying jurors to the county jury array. The town quota system, however, does not fix the quota of jurors in proportion to the size of the town's population. Petitioner's exhibit 2 demonstrates the results of the failure to make the town's quota proportionate to the size of its population. Beacon Falls is the smallest town in New Haven County with a population of 3,546. According to section 51–220, Beacon Falls is required to meet a quota of ninety jurors. New Haven is the largest city in New Haven County with a population of 137,707. New Haven has a quota of 1,012 jurors. Yet, 90 jurors represents 2.5% of Beacon Fall's population, while 1012 jurors represents only 0.7% of New Haven's population. Petitioners thus allege that the town quota system creates a bias in favor of overrepresenting small towns on the jury arrays in New Haven County, while underrepresenting large towns.

Using census figures taken from the 1970 census of New Haven County, the petitioners demonstrated a correlation between the size of an individual town's population and the proportionate size of its Black community. These figures indicate that in smaller towns, the Black population makes up a smaller percentage of the town's population than in larger towns where the percentage of the Black population is proportionately higher. The petitioners argue that Blacks are therefore underrepresented on jury arrays since the statute causes an overrepresentation of smaller towns on the jury array with proportionately smaller Black populations than those of larger towns and cities.

In their petitions, Alston and Haskins have quantified the claimed exclusion of Blacks from the jury array by comparing the estimated number of Black jurors appearing in an array representative of the Black population with the expected number of Blacks appearing in an array formed by the town quota system. More specifically, in a representative array of 8,405 prospective jurors, 501 Black jurors ought to appear, since the population of New Haven County is 5.96% Black. Under the town quota system, however, the expected number of Black jurors falls to 368. According to petitioners, the town quota system creates an exclusion of 133 Black jurors from the number one would expect to find had the jury array been representative of the entire community.

To demonstrate the significance of the claimed exclusion, the petitioners employ a statistical probability analysis which calculates the probability of such an exclusion

occurring by chance at less than three in one billion. The state does not challenge the accuracy or propriety of these statistics, but rather contends that any underrepresentation of Blacks on the New Haven County jury array was due to the voter registration lists used to select jurors within each town.

*Discussion*

The United States Supreme Court in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), established the elements of a *prima facie* case challenging jury selection procedures which violate the Fourteenth Amendment. First, a defendant must show that the excluded group is distinctive and cognizable within the community. *Id.* at 494, 97 S.Ct. at 1280. Second, the underrepresentation must be substantial. *Id.* This showing of substantiality is also known as the "rule of exclusion". As a third consideration, the Court noted that a selection procedure which is susceptible of abuse or not racially neutral, lends further support to a statistical showing of purposeful discrimination. *Id.* Once a defendant has established a *prima facie* case under *Castaneda*, the burden of proof shifts to the state to rebut a presumption of intentional discrimination by showing that the manner of jury selection serves a legitimate state purpose. *Id.* at 497–98, 97 S.Ct. at 1281–82.

■ The petitioners have met the first element of an equal protection challenge under *Castaneda*. The Supreme Court has expressly recognized that Blacks are a cognizable group for purposes of challenging jury selection procedures in *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970). Petitioners have also satisfied *Castaneda's* third criterion in making out a *prima facie* challenge to the jury selection statute. Even assuming that the town quota system was mechanically applied and devoid of any subjective determinations made by jury selection officials, the statute operates directly to exclude Blacks from the jury array. Since the statute itself mandates the exclusion of Blacks, evidence of abuse in its application is irrele-

vant to the issue of discriminatory intent on the part of the legislature. The very structure of the statute provides support for the presumption of discriminatory purpose raised by the statistical showing.

The remaining issue then is whether petitioners have satisfied the rule of exclusion as *Castaneda's* second element of an equal protection claim. As noted above, the petitioners rely heavily on a probability analysis in demonstrating that the claimed exclusion is substantial. This method of determining substantial underrepresentation is known as Statistical Decision Theory (SDT). Proponents of SDT stress that it is a more precise indicator of intentional underrepresentation than that measured by the absolute disparity method. *See* Finklestein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv.L.Rev. 338 (1966). The absolute disparity test compares the percentage of the excluded group appearing on jury arrays with the percentage of the group appearing in the general population. Statistical Decision Theory, however, measures the probability that a given exclusion would occur by chance rather than by design. Under this analysis, a low probability that an exclusion would occur merely by chance has been considered sufficient to raise a presumption of discriminatory intent. *See, e.g., Castaneda v. Partida*, 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17; *Villafane v. Manson*, 504 F.Supp. 78 (D.Conn.1980); *Hillery v. Pulley*, 563 F.Supp. 1228 (E.D.Cal.1983).

■ Unlike the absolute disparity method, SDT takes into account the size of the group being evalutated. *See Moultrie v. Martin*, 690 F.2d 1078, 1083 (4th Cir.1982). This analysis is particularly useful when the population being considered is relatively small. *Id.* at 1083. Where the excluded group represents only a small percentage of the entire community, the difference between the percentage of the group appearing on the jury array and the percentage of the group appearing in the general population is correspondingly small. As measured by the absolute disparity method,

small disparities are not considered sufficient to satisfy the substantiality requirement. *See, e.g., Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) (11–16% disparity insufficient under Fourteenth Amendment). Statistical Decision Theory, however, can accurately measure the probability of intentional discrimination even where small samples are involved. *See Moultrie,* 690 F.2d at 1083; *Villafane,* 504 F.Supp. at 86. Accordingly, application of SDT is particularly appropriate where, as here, the excluded group comprises only a small percentage of the total population.

In *United States v. Zimmerli,* Crim. No. B–83–57 (D.Conn.1984), this Court refused to apply SDT to a challenge to grand and petit jury selection procedures utilized in this district. These challenges were based on the Sixth Amendment to the United States Constitution and the Jury Selection and Service Act of 1968. 28 U.S.C. § 1861 *et seq.* (1982). Instead, reliance was placed on *United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974). *Jenkins* held that disparities which do not result in a significant numerical difference in the composition of actual jury arrays are insufficient to establish a violation of the Constitution or the Jury Selection and Service Act. *Id.* at 65. Significantly, intent was not a required element of either challenge to the jury selection procedures made in *Zimmerli.* This added element of intent in equal protection cases distinguishes *Zimmerli* from the case at bar when selecting the appropriate gauge to be used in determining substantial underrepresentation.

In *Duren v. Missouri,* 439 U.S. 357, 363, 368 n. 26, 99 S.Ct. 664, 668, 670 n. 26; 58 L.Ed.2d 579 (1979), the Supreme Court noted that evidence of a significant discrepancy must represent not only discriminatory effect in an equal protection claim, but also discriminatory purpose. The Court distinguished this showing of intent from that required under a Sixth Amendment chal-

lenge where "systematic disproportion itself" is sufficient to establish a *prima facie* claim. *Id.* Thus, in equal protection cases where intent must be shown in addition to disparate treatment, courts have appropriately resorted to the more precise analysis employed by Statistical Decision Theory. *See., e.g., Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17; *Hazelwood School District v. United States,* 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1976) (employment discrimination); *Board of Education of City School Dist. of New York v. Califano,* 584 F.2d 576, 584 n. 29 (2d Cir.1978) (employment discrimination); *Moultrie v. Martin,* 690 F.2d 1078 (9th Cir.1982) (jury selection); *Villafane v. Manson,* 504 F.Supp. 78 (D.Conn.1980) (same); *Hillery v. Pulley,* 563 F.Supp. 1228 (E.D.Cal.1983) (same); *State v. Castonguay,* 194 Conn. 416, 427–28, 481 A.2d 56, 63 (1984) (same).

■ Applying SDT to the case at bar, the petitioners clearly have satisfied the rule of exclusion set out in *Castaneda.* As noted above, the probability of an exclusion of 133 Black jurors out of an array of 8405 occurring by chance is less than three in one billion. This highly remote probability is sufficient to create a presumption of purposeful discrimination regarding the exclusion of Black jurors caused by § 51–220.[2]

Having satisfied the three requirements under *Castaneda,* the Court concludes that petitioners have met their burden in establishing a *prima facie* case of discrimination in the jury selection process. The state argues, however, that any disparate treatment of Blacks on the New Haven County jury array is due solely to the use of voter registration lists in selecting jurors. According to the state, since Blacks register to vote in smaller proportions than do whites, the underrepresentation can be explained on grounds apart from the statute. This argument fails to recognize the fact that the statute operates directly to ex-

**2.** The Connecticut General Assembly has since repealed that portion of § 51–220 under which petitioners' jury array was selected and which

the Court today finds to be unconstitutional. *See* 1982 Conn.Legis.Serv. 82–307 (West).

clude Blacks. Even if no voter registration lists were used, an underrepresentation of Blacks on the jury array would still result. Therefore, the use of voter registration lists is irrelevant to the determination of the disparate treatment caused by section 51–220 itself. The state offers no other explanation for the exclusion of Blacks. No attempt has been made to demonstrate that the town quota system serves a legitimate state purpose. Thus, the presumption of purposeful discrimination raised by the petitioners has gone unrebutted. Accordingly, Alston's and Haskins' petitions for writs of habeas corpus are hereby GRANTED. The petitioners shall be released from state custody unless the state moves for retrials within 30 days of today's date.