UNITED STATES of America, Plaintiff,

v.

Michael Eugene VINSON, Defendant.

Crim. A. No. 3:87–00009.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 7, 1987.

432

Don Dawson, Asst. Public Defender, Nashville, for plaintiff.

William Warren, Asst. U.S. Atty., Nashville, for defendant.

NEESE, Senior District Judge, Sitting by Designation and Assignment.

## MEMORANDUM OPINION AND ORDER

Messrs. Glenn Yates and Joe Hooper, of the Metropolitan Nashville and Davidson County, Tennessee, police department, were on patrol on their respective motorcycles in the early afternoon of Sunday, May 24, 1986, of Memorial Day weekend, on a ramp leading to interstate highway route no. 40, east of downtown Nashville. They observed approaching and passing them on such route a number of motorcycles moving two-abreast in two lines in the outermost eastbound lane and made an investigatory stop of all such motorcycles to ascertain any of them which were being operated in violation of traffic laws. The investigating officers requested by radio communication "a back-up" to which Mr. Robert Baltz, of the tactical squad of such Department, responded.

The investigators required all the riders of the motorcycles they had thus stopped to pull-off the more traversed part of the route and to remain beside the respective motorcycles each had been operating until the officers could ascertain just which of the operators were in violation of the law. Mr. Yates suspected from what he had heard that several of these motorcycles were in violation of an ordinance limiting the degree of noise such vehicles could make lawfully, and each operator was required in the investigation to start the engine of the motorcycle he had been operating to assist this officer in ascertaining that level.

When the officers investigated the machine which had been operated by the defendant Mr. Michael Vinson, they concluded the noise it made was "too loud" and that it was equipped with "straight pipes" with no baffle. Mr. Hooper wrote an appearance-ticket for Mr. Vinson's operating a motorcycle without a muffler. Ms. Shawnee Lynn Dailey, who had been riding as a passenger on the vehicle Mr. Vinson operated, and Mr. Vinson were present together near such vehicle during this process.

Mr. Yates continued his investigation, and Mr. Vinson produced his valid drivers' license. It was then discovered that Mr. Vinson did not have on his person or in his possession a registration-certificate for the vehicle he had been operating,[1] and Mr. Vinson was given a second appearance-ticket for that alleged violation of the law of Tennessee.

---

1. Mr. Vinson's personally-owned motorcycle was under repair, and he had borrowed from a friend the vehicle he had been operating.

(There was no claim that such motorcycle had been stolen.)

Mr. Yates inquired of Ms. Dailey and Mr. Vinson "if they had any type of weapons or drugs," although neither had then been placed in custodial-arrest. It was not claimed by Mr. Yates in his testimony that he possessed any information at that time giving him reasonable cause to suspect that either such investigatee "had" possession of a weapon or of any drugs; "that was just a question I asked," he explained.

According to Mr. Yates: "Ms. Dailey spoke up readily and said there was a pistol in the saddlebag [on the motorcycle], at which time I asked if it was loaded. And, Mr. Vinson spoke up and said, 'yes,' it was." * * * We opened the saddlebag and retrieved a loaded [it had six or seven rounds in the clip] 380 automatic Baretta pistol. * * * [W]e placed Ms. Dailey and he [sic: Mr. Vinson] both under arrest "[for] carrying a [concealed] weapon. * * *

"Ms. Dailey stated that she had borrowed the pistol from a friend of hers, and they were going to some type of gathering * * * and needed it for protection."

Mr. Yates testified that, prior to making the investigative stop of this group of motorcycle riders (and passengers), he had observed also that some of them did not have the headlights of such vehicles illuminated (as required in Tennessee); that some of them were not wearing the required[2] face-shields; that some did not have a mirror on the left side of such vehicle; and that the motorcycles in question "were actually following too close." He added that previously it had been unlawful for two motorcycles to be ridden abreast, but now such a formation is "legal."[3] See T.C.A. § 55–8–182(d). He was unable to ascertain, however, that Mr. Vinson personally or the motorcycle he was operating was in violation of the law *before* he made the investigative-stop of the entire group of these vehicles.

Mr. Hooper, the other investigating officer, who was at approximately the same vantage point as Mr. Yates when the group of motorcycles emerged into their view, said only initially that "[s]everal of them had loud mufflers, real loud * * *." He added subsequently that, when the assistance of a "back-up" was requested: "We said there were several motorcycles wearing the Grim Reapers' Club colors."[4]

This fact appeared to disturb Mr. Hooper: "There was [sic] only two of us and several of them," he continued. He noticed also some of the vehicles bore license tags from other states, and testified he remembered there are "a lot [of] convicted felons, known to traffic [in] drugs and possess firearm" in this and other motorcycle 'gangs'." He recalled afterward also some motorcycles in the group were being operated without illuminated headlights.

The "back-up" officer, Mr. Baltz, couldn't recall anything clearly, but had some recollection, that he asked Mr. Vinson if he "had any firearms or drugs" after he saw a piece of jewelry around the defendant's neck in the form of "a coke spoon" but did not remember whether he had stated to him that this gave the officers cause to search the saddlebag on the motorcycle he had been operating. Mr. Hooper remembered that Mr. Baltz had mentioned to Mr. Yates that Mr. Vinson was wearing such jewelry around his neck before the saddlebag was searched.

The Court drew mildly the inference that the investigating officers implicated gave more weight than was admitted by them to the indication that members of the Grim Reapers were included in the group they stopped and to the jewelry worn by Mr. Vinson, which was in the shape of a "coke spoon." Whether that object constituted "drug paraphernalia as defined by [T.C.A.] § 39–6–402," T.C.A. § 39–6–455, turned on the state of mind of Mr. Vinson or his act

---

**2.** Such face-shields are not required if a person riding a motorcycle is wearing impact-resistant sunglasses approved by the pertinent governmental agency, according to the officers.

**3.** Mr. Mark Clements, another operator, testified he was given a traffic ticket for such a violation.

**4.** Mr. Hooper didn't recall whether he had advised the investigatees he had stopped them because some were wearing patches of this Club.

with respect thereto; items typically used for illegal purposes may in fact be used for legitimate purposes and many items typically used for legitimate purposes may be used as drug paraphernalia as such use "is limited only by the imagination of the user." *Record Revolution No. 6, Inc. v. City of Parma,* 638 F.2d 916, 928, 930 (6th Cir.1980).

■ "Specific intent" is the key to determining whether something is or is not to be regarded as drug paraphernalia. *New England Accessories Trade Ass'n v. Browne,* 502 F.Supp. 1245, 1250–1251 (D.C. Conn.1980). Mr. Vinson testified he had no such "intent", general or specific, and there was no evidence offered in contradistinction thereto by the prosecution.

Mr. Baltz admitted having advised an investigator from the office of the federal public-defender pretrial that mere membership in a motorcycle club or displaying indicia of such membership constituted probable-cause for an officer to stop a motorcycle for investigation, although he testified it was not the custom and practice of members of his Department to stop and investigate for that reason alone.

Testimony of the defendant and his witnesses was undisputed that there were 10 persons riding upon six motorcycles in the group before they were stopped, with Mr. Vinson and Ms. Dailey riding "double" on one of the frontmost vehicles, and that the only cyclists with indicia of membership in the Grim Reapers were not Mr. Vinson, but other riders in the front row.

Ms. Dailey testified that she had packed the pistol in the saddlebag of the motorcycle on which she had been riding behind Mr. Vinson; that no one else knew it was there so far as she knew; and that she had admitted its presence therein only after one of the investigators described the jewelry Mr. Vinson was wearing as "drug paraphernalia" and claimed probable-cause therefrom "to search our bike."

■ The Court FINDS and CONCLUDES that Messrs. Yates and Hooper acted constitutionally from what they heard and may have seen in approaching the defendant and his companions for purposes of investigating possible criminal behavior on the part of some of them. "The [Constitution,] Fourth Amendment[,] does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. * * * [I]t may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual in order * * * to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time. * * *" *Adams v. Williams,* 407 U.S. 143, 145–146, 92 S.Ct. 1921, 1923 [1, 2], 32 L.Ed.2d 612 (1972).

The Court FINDS further that the search of the saddlebag of the motorcycle on which Mr. Vinson and Ms. Dailey had been riding when thus stopped was not incident to a custodial-arrest of either of them, and, upon stipulation, FINDS that neither such officer was armed with a warrant issued in the judicial process by a judge or magistrate authorizing a search of such saddlebag. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the [Constitution,] Fourth amendment—subject only to a few specifically established and well-delineated exceptions. [References to footnotes omitted.]" *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514 [19], 19 L.Ed.2d 576 (1967).

The Supreme Court of the United States stressed the fact that its decision in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), "does not mean that the police may conduct automobile [or other motor-vehicular] searches *whenever* [as in orig.] they conduct an investigative stop," 463 U.S. at 1050 n. 14, 103 S.Ct. at 3481 n. 14. "[W]e require that officers who conduct area searches[5] during investi-

---

5. With that level of suspicion gained by a law-enforcement officer, "a search may be made of the area within the control of the arrestee."

gative detentions must do so only when they have the level of suspicion identified in *Terry [v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]." *Idem.*

"When the officer has a reasonable belief 'that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *Ibid.,* 463 U.S. at 1047, 103 S.Ct. at 3479. There was no suggestion in the evidence by Messrs. Yates, Hooper or Baltz of a reasonable belief by any of them that Mr. Vinson was armed or otherwise presently dangerous to either of those officers or others beyond the suspicion .of Mr. Hooper that Grim Reapers might be convicted felons "known to * * * possess firearms," which this Court FINDS did not constitute a reasonable belief thereof.

Courts cannot "excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193 [3], 93 L.Ed. 153 (1948), cited in *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95 [3], 96 L.Ed. 59 (1951). The subjective good-faith belief of a law-enforcement officer, that he or she is authorized to make an arrest and a subsequent search, does not itself justify either such an arrest or such subsequent search, *Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 1110 [3], 28 L.Ed.2d 484 (1971), and "in judging the legality of a search, courts must apply an objective standard * * * ," *United States v. Jenkins,* 496 F.2d 57, 72 [23] (2d Cir.1974).

*Jenkins* also involved the warrantless search and seizure of a weapon from the saddlebag of a motorcycle; but, therein, contrary to the matter *sub judice,* the facts and circumstances known to the investigating officer had provided probable cause for

the officer to believe that the vehicle he had stopped was stolen. This had given the investigator probable cause to arrest Mr. Jenkins immediately for that offense and to search the vehicle as an incident of such arrest. *Ibid.,* 496 F.2d at 72; *cf.* also *United States v. Zemke,* 457 F.2d 110 (7th Cir.1972), *cert. den.,* 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972).

As in *Jenkins,* when Ms. Dailey advised Mr. Yates that a weapon she possessed was in the saddlebag implicated, this gave Mr. Yates probable cause to arrest her immediately for the offense of carrying a concealed weapon and to search the motorcycle as an incident thereof. Nevertheless, *Adams v. Williams, supra,* did not authorize the investigating officers to invade the privacy of Mr. Vinson, as urged by the prosecution, in search of *evidence* of crime on his part.

The investigating officer in *Adams* was authorized to make a limited protective-search of Mr. Williams and the vehicle in which he was seated for concealed weapons after having been advised by a reliable informant that Mr. Williams had a gun at his waist while seated in the vehicle nearby. It was made crystal clear, however, by that decision that "[t]he purpose of this limited protective search is not to discover evidence of crime," *ibid.,* 407 U.S. at 146, 92 S.Ct. at 1923 [3].

■ Mr. Yates' inquiry of Ms. Dailey and Mr. Vinson was whether "they had any type of weapons *or drugs* [emphasis by this writer]." The Court FINDS that the search of the saddlebag by Mr. Yates was with his specific and concomitantly-stated purpose of discovering evidence of crime against Mr. Vinson, as well as against Ms. Dailey.

After Ms. Dailey's admission, Mr. Yates was authorized to look in the saddlebag in search of the object of his search, as a place where he had probable cause to believe the pistol would be found, *United States v. Ross,* 456 U.S. 798, 824, 102 S.Ct. 2157, 2172 [8], 72 L.Ed.2d 572 (1982); this was an exception to the requirement for a

*United States v. Robinson,* 414 U.S. 218, 224, 94    S.Ct. 467, 471, 38 L.Ed.2d 427 (1973).

warrant, *supra,* which is "specifically established and well delineated," *ibid.,* 456 U.S. at 825, 102 S.Ct. at 2173. That the search preceded the custodial-arrest did not render it illegal as probable cause to arrest existed when the search was made, *United States v. Jenkins, supra,* 496 F.2d at 73 [24]; even so, Mr. Yates was limited in scope to a search which was "no broader and no narrower that a magistrate could [have] legitimately authorize[d] by warrant," *ibid.,* 456 U.S. at 825, 102 S.Ct. at 2173.

Despite the fact that Mr. Vinson had been operating recently the motorcycle on which Ms. Dailey had been riding in close proximity, and despite the additional fact that Mr. Vinson was in close proximity to Ms. Dailey when she became suspected, independently of him, of criminal activity, he retained a legitimate expectation of the privacy of his own effects. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person [or his or her effects]." *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342 [1], 62 L.Ed.2d 238 (1979).

As the search of the saddlebag by Mr. Yates and seizure therefrom of the described weapon in possession of Ms. Dailey is FOUND to have been for the purpose of discovering evidence of crime in the guise of a limited protective-search, the Court FINDS and CONCLUDES that such warrantless search was *per se* unreasonable and violative of the Constitution, Fourth Amendment, *supra.* The motion of the defendant therefor hereby is

GRANTED, and evidence of the weapon seized in such search hereby is

SUPPRESSED.